## DE FRANCE v. HOWARD et al.

Where a creditor's bill was filed in September, 1854, which did not require the respondents to answer under oath, and the answer to which was not sworn to; and where, after the cause had been pending two or three terms, and over a year, the respondents asked and obtained leave to file an amended answer, in the nature of a plea, and on the 16th of June, 1856, filed an answer, consisting of the entire former one, with an addition setting up other matter, which amended answer was sworn to; *Held*, That the answer could not be treated as a sworn answer.

In proceedings under a creditor's bill, to reach real estate alleged to have been fraudulently conveyed, neither the answer of the grantor, in a chancery suit, nor his oral declarations made, nor letters subsequent to the conveyance, are receivable in evidence to affect the title of the grantee, without evidence that the grantee colluded with the grantor, with a fraudulent intent.

And the declarations of the grantor, made after such conveyance, are not receivable in evidence, to show such collusion.

*Appeal from the Muscatine District Court.*

ON the first day of May, A. D. 1854, James M. De France recovered judgment against William Howard for the sum of $1,231.12 and costs, in the District Court, in Scott county. Execution was issued and returned *nulla bona*. On the first of September, A. D. 1854, De France filed his bill in Chancery against the said Howard, and McGregor & Lawes, alleging such matter as will appear from the following statement: On the 18th August, 1852, the defendant Howard entered into arrangements with McGregor & Lawes, who were bankers, for pecuniary accommodations from time to time; and to that end executed to them his promissory note for three thousand dollars, payable one year from date, and as security gave a mortgage on fifteen lots, in a certain block in Tichenor's addition to the town of Davenport. There were sixteen lots in the block. On number eleven was situate a steam saw mill, and on numbers eight and nine, he was then building, and did build, a dwelling-house. To the lots numbered from five

to eleven inclusive, he had title, but to the remainder, numbers one to four, and twelve to sixteen, inclusive, he had not perfect title, but held a title bond from one Whistler, on which was due the sum of $1,533.50. Lot number eleven, on which was the saw mill, was not contained in the mortgage. Howard was to make deposits with McGregor & Lawes, and to be allowed six per cent. interest upon them, and he was to pay two and a half per cent. interest per month upon advances drawn. About the 30th April, 1853, or between that and the 2d of May, it is alleged that Howard absconded, as well as one Weeks, with whom Howard was in partnership. The transaction appears to include the debts and affairs of Howard & Weeks, as well as those of Howard alone. The latter was the active partner. The complainant alleges that at a settlement in April, 1853, the parties found due to McGregor & Lawes about $2,670, beside $1,533.50, due Whistler on his bond, making a total of $4,203, but avers that such sum was not due in fact, for that Howard had placed in their hands 436 barrels of flour, which produced the clear sum of $1,303, which would leave but $2,885 due the complainants, including that due Whistler. On the 30th April, 1853, Howard conveyed to McGregor & Lawes, by absolute deed, the lots numbered five, six, seven, ten and eleven, and assigned the bond from Whistler, which included lots numbered one to four, and twelve to sixteen, inclusive. This conveyance and assignment the complainant alleges to have been with intent to hinder, delay and defraud the creditors of Howard, and therefore to be fraudulent and void as to them.

The respondents, McGregor & Lawes, deny the alleged fraudulent intent, and all knowledge of any intent, on the part of Howard & Weeks to leave secretly, or to defraud their creditors, and claim that the transaction was *bona fide* on their part, and for a good and valuable consideration. They claim that on the above settlement, there were due them $3,623.60, after allowing the $1,308 for the flour, and on Whistler's bond $1,533.50, and that there were certain other debts of Howard & Weeks, which they undertook to

pay, and did pay, amounting to $2,378.01. The considera-
tion stated in the deed from Howard to McGregor & Lawes,
is $7,000. On the 18th August, 1853, Howard conveyed
to McGregor & Lawes lots eight and nine in the said block,
being the remainder of the said sixteen lots. The complain-
ant avers that at this time Howard secretly returned to Dav-
enport, and made the above conveyance, also to defraud
his creditors; and that the defendants paid only the sum
first named, that is, the $2,885. The respondents answer
that these lots constitute the homestead of Howard, and
were exempt from liability for debt, and that they took the
conveyance thereof *bona fide*, and paid a valuable consider-
ation therefor, viz: $1,700 down, paid to the wife of How-
ard, and gave their obligation for $300, the balance, subject
to an attachment which had been levied on those lots, and
to await the result of that attachment. The plaintiffs charge
fraud in all these conveyances and transactions, and an in-
tent on both parties to defraud the creditors of Howard &
Weeks. The defendants, McGregor & Lawes, deny all
such fraud in fact and in intent. Howard makes default.
It is farther alleged, and it appears, that on the 26th of
December, 1853, McGregor & Lawes sold all the above lots
and property, to one John M. Cannon, for the consideration
of $10,000. The petitioners did not call for an answer un-
der oath, and it was not sworn to.

The petition was filed in September, 1854, and after the
cause had been pending two or three terms, and during the
space of twelve months, the respondents asked and obtained
leave to file an amended answer in the nature of a plea, and
on the 6th June, 1856, filed an answer, consisting first, of the
entire former answer, and secondly, of a statement of judg-
ments to the amount of $3,519.87, of which they claim to
have become the purchasers and assignees, which were ren-
dered against said Howard, on the 4th of October, 1853,
and which defendants claim to have constituted liens on the
said property prior to the judgment of the complainant.
To this amended or supplemental answer, the defendants,
make oath, and the petitioner objects, and moves to strike

out the *jurat*.  Among the evidence offered, the plaintiff files the depositions of Cook, Barrows, Arndt, Stevenson, &c., a prominent feature in which, is the declarations of Howard made subsequently to one or both of the foregoing conveyances.  The petitioner also offers letters of both McGregor and Howard.  He further introduces as evidence the bill, answers, replication, exhibits, and in short all the papers constituting the case of Wilbur, Brown & *al.* against the said Howard & Weeks, McGregor & Lawes, and Cannon, and the entire record in the case of *Corwith & Co.* v. *Howard*.  The respondents appeal.

*Mitchell & Putnam*, for the appellants.

*Whitaker & Grant*, for the appellee.

WOODWARD, J.—This cause, during its progress and examination, becomes somewhat complicated, and many questions, some of which are. of intrinsic consequence, are raised; but under the view which we ultimately take, it will not be necessary to enter into a consideration of all of them, and we may pass some of them with brief notice. Under the circumstance that the answer is not sworn to, and that the defendants obtained leave to amend their answer in the nature of a plea, and then filed their original answer with the addition of matter of the proper nature, is raised the question, whether the common-law rule as to answers in Chancery, or the Code, prevails.  In other words, it is the question, whether an answer in Chancery can be sworn to with any effect, unless such verification is called for.  As desirable as it is that this question should be settled, yet, as it would involve a very considerable discussion, we do not feel inclined, under the pressure of imperative business, to stop and consider it, inasmuch as the necessity of so doing is obviated by the view which we take of the cause.  We feel satisfied that, even at common law, the defendants, having so long omitted to make oath to their answer, and on application having been refused by the

court, cannot produce the desired effect, by incorporating a little new matter, under the special leave given, into their old answer, and making affidavit to it. This cannot give the force of a sworn answer to the original one. But it will be seen that this question is of but little practical importance in its relation to the present cause.

A more important inquiry arises, on the aim of the petitioner to affect McGregor & Lawes, with knowledge of, and participation in, the alleged fraud, by means of the evidence afforded in the declarations of Howard, subsequent to one or both of the conveyances, by his letters to McGregor and others, and by his answer in the former suit of Wilbur, Brown *et al.* against these parties. A prominent feature in the depositions offered, is the declarations and admissions of Howard. A few words may be necessary for the understanding of the cause of Wilbur and others, before alluded to. On the 4th of October, 1853, Wilbur, Brown, Kurtz, Parker and Corwith, in their several suits, recovered judgments, in Scott county, against the said Howard & Weeks, for their respective claims, amounting in all to the sum of $3,548.43, or thereabouts, including cost. On the 14th of January, 1854, they joined, as creditors, in a bill against Howard & Weeks, McGregor & Lawes, and Cannon, the intent and object of which bill was identical with that of the bill in the present cause. The venue was changed from Scott to Muscatine county, and such proceedings were had, that on the 18th of October, 1855, the cause was settled by the parties, by an agreement in writing, which is entered of record, and by which those complainants acknowledge the receipt of the full amount of their respective judgments from McGregor & Lawes, in consideration of which they assign and transfer the same to them. Upon this, the following decree was rendered: "And now on this 18th day of October, A. D. 1855, come the said parties by their attorneys, and file the foregoing agreement in this case. Whereupon the court do now here order, adjudge and decree, that the said cause be finally disposed of as stipulated in said agreement. And it appearing that the plaintiffs

have severally received the amount of their respective claims, and that the plaintiffs have ·assigned the said judgments against Howard & Weeks and Wm. Howard, to the said McGregor & Lawes, it is further ordered that the said McGregor & Lawes take and hold said judgments in their own right, and control the same as they now stand of record in the said Scott county District Court." It is the answer of Howard in that suit, which the complainant seeks to make evidence against his co-defendants in the present proceeding.

But neither that answer of Howard, nor his oral declarations, nor his letters, are admissible for this purpose. The cases and authorities cited by counsel to support his position, namely, *Osborn* v. *Bank U. S.*, 9 Wheat. 738, and 1 Greenl. Ev. §§ 176, 178, and those cited by Mr. Greenleaf, do not apply to the present case. If we trust to the general expressions, "claiming through" or under, or "deriving title from," or "taking in succession," we may be misled. We must look at the facts of the case, and see the actual relation of the parties. Thus, if one takes by inheritance or devise, and in like cases, he is bound by the answer and declarations of his ancestor, and so it is probably with one coming in *pendente lite*, and the above cases exhibit other instances. But none of these authorities, and perhaps no other one, holds that the grantor can affect the title of his grantee, by his answer or his declarations. The case of *Christie* v. *Bishop*, 1 Barb. Ch. R. 105, correctly states the law on this subject, and explains some of the cases cited by counsel and by Mr. Greenleaf.

Without the evidence here alluded to, it is not easy to regard McGregor & Lawes as participating in a fraud— uniting with Howard to defraud his creditors. Nor do we mean to intimate how it would be, were the answer of Howard received, for we have not looked at it, having first settled the question of its admissibility. But it is said that such evidence is receivable against a co-defendant, they being shown to be colluding—to be uniting in a common purpose. Then, this purpose must first be made out by other evi-

dence, for you cannot, at the same time, make the evidence admissible by showing the collusion, and prove the collusion by the same evidence. The letters of McGregor are not sufficient for this point. They serve another purpose better. So far as the practical result, in our view of the case, is concerned, we should not object to treating the conveyance to McGregor & Lawes as a mortgage, but we are not prepared for the rigid application to it of the rules of law upon secret trusts, so as to declare it constructively fraudulent *in toto*. That McGregor & Lawes were purchasers for a valuable consideration, to some extent, (not now saying how far), is beyond question, and the evidence does not satisfy us that they were participants in an intent fraudulent in fact.

But there is a view of the case, which is competent to do justice to all the parties, without the application of harsh rules, and which we think far more adapted to the actual state of the facts. There is some evidence tending to show that McGregor & Lawes took the property as in mortgage, or more correctly speaking, showing that whilst they actually bought it, yet they were not desirous to hold it, but that Howard, or even any creditor who would satisfy their demands, might take it. This appears to our minds a more just construction to put upon the language of McGregor to some of the witnesses, and that in his letter to Howard. Thus, when Barrows was negotiating about selling the property on commission, McGregor said he wanted "what was due him on the premises, in cash." To Cook, he said, "he did not want the property, but wanted his money to use in his business;" and in his letter to Howard, he says, "knowing as I do, that we bought the property in good faith, and for what we considered a valuable consideration, I feel confident that we can hold it; but I still say to you, as heretofore, that we will, at any time, while we own the property, deed it back to you for what it has cost us, and a fair compensation for the expense and trouble we have been at, and I still hope to see you back and re-instated." It is true that some points look unfavorable for these defendants;

such are the statements of different amounts as due them, and the different manners of making up the amount of the consideration stated in the deed. But the principal view is suggested by Cannon's connection with the transaction. The property is sold to and bought by him. And this takes place before this plaintiff obtained his judgement. Is Cannon to be taken as a fraudulent purchaser? Of course not, since he is not made a party to the present suit. What, then, is the claim of the complainant, in this respect? To answer this question, we must go back. The whole record in the cause of Wilbur, Brown & al., is made evidence in this· Cannon was made a party defendant in that cause, but he was not charged with fraud, nor was an attempt made to recover the property from him on account of such fraud; but the intent was to arrest and charge a portion of the unpaid purchase money in his hands. In the present case, Cannon is not made a party, but that unpaid purchase money is the object aimed at. In December, 1853, when McGregor & Lawes sold to Cannon, he paid $3,000 down, and gave his four promissory notes for the balance, two of them negotiable, and the last two, payable in eighteen and twenty-four months, for $1,500 each, not negotiable. And a written agreement was entered into between the parties, reciting that a suit had been commenced by Ira Brown and others, "in relation to said property, against said Howard and ourselves," and providing that if those creditors should establish their claims against said Cannon, or the property in his hands, the amount of such claims should be deducted from the purchase money. The last clause of the agreement contains the substance of the whole, and is in these words: "It is distinctly understood and agreed, that in case said Brown and others, succeed in establishing their claims against the property, and Cannon has to pay the same, all the balance of the purchase money, except what may be paid to said creditors, is to be paid to McGregor & Lawes."

Now, what does the present bill charge in respect to this? It is, that McGregor & Lawes sold to Cannon, "with the understanding, that if certain creditors of Howard should

effect a recovery against Cannon for the said lots, or money due therefor, the said McGregor & Lawes were to save the said Cannon from any and all loss in the premises," which money due from Cannon, or which may have been paid by him to said McGregor & Lawes, was held by them in secret trust for the benefit of the defendant Howard. Afterwards, during the pendency of this suit, the unpaid balance, due at the time of service upon Cannon, was paid by him to McGregor & Lawes, under a written agreement between the parties to the suit, that such payment should not in any wise affect the case. The complainant claims that under any aspect of the case, he is entitled to an account of the proceeds of the sales of the said property, and a decree for his debt so far as the said proceeds shall extend, and he prays that an account may be taken of the value of the lots so conveyed by Howard to McGregor & Lawes, and that he may have a decree for his debt and costs against the defendants, and such other relief, &c. It is impracticable to set forth the full detail of facts and considerations, as developed by the answers, testimony and papers of the two causes, (the other being made evidence so far as admissible,) without extending this opinion too largely.

Perhaps enough has been shown to bring us to our conclusion, and the result at which we have arrived, after a careful consideration, is, that if the property were still in the hands of McGregor & Lawes, they must be regarded as holding it as in mortgage. And that the property having been sold by them to an innocent purchaser, for a valuable consideration, which they have received, they must stand accountable for the proceeds, and are chargeable for the residue, after the payment of their just demands.

Several questions of inferior moment are suggested in the progress of the case, but the foregoing views will cover all that is important, save such as connect themselves with the only remaining one, and that is, what are to be treated as the just demands of the respondents, McGregor & Lawes, or by what rules shall they be ascertained? These demands divide themselves into three clases. *First.* Their payments

made to and for Howard, under the agreement made 18th of August, 1852. In other words, their bank account, amounting as claimed by them, to $3,623.60. *Secondly*. Certain debts and demands paid by them, as set forth in the answer, amounting to $2,378.01. *Thirdly*. The judgments assigned and paid on the rendering of the decree by the District Court in Muscatine county, and embraced in that decree, on the 18th of October, 1855, amounting to $3,548.43. The defendants are entitled to the first class under the view which we take of the cause. If we could hold it tainted with fraud, so as to treat it as absolutely void, this would be different. Of their right to the second class, no question is made. On the third class, two remarks are to be made. These demands and their assignment, enter into and form a part of the decree rendered in Muscatine county, on the 18th of October, 1855, constituting the basis of the same. The other remark is, that they were judgments rendered prior to the petitioner's, and constitute prior liens on the property, and as would seem to us, they have been paid fairly and *bona fide* under the cognizance of the court. The second and third classes are, perpaps, sufficiently defined in the papers before us, and so far as they are concerned, it may be that a decree might be rendered in this court. But it is otherwise with the first class. Properly speaking, there is no evidence in the case upon them. The detail of proof is wanting, and we do not feel at liberty to undertake their adjudication. They require to be referred to a master, or dealt with in some other proper method, to ascertain the amount of debts and credits, and the interest due on the advances. And farther, we do not think it proper to determine, in anticipation, the rate of interest to be allowed. These matters are left open to the adjudication of the District Court.

The result of the inquiry directed in the following decree, may accord with and sustain the decree of the District Court, but that court has rendered its decision absolutely, without the inquiry, which we deem requisite. In other words, that court proceeds upon the ground of absolute

fraud, whilst this only holds the party accountable, and subject to the payment of any balance remaining after the payment of their proper claims.

Decree reversed.